1

2

3

4

5

6

7

8             IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   WILLIAM THOMAS COATS,

11           Plaintiff,                    No. 2:09-cv-1830 KJM KJN P

12       vs.

13   T. KIMURA, et al,

14           Defendants.              FINDINGS AND RECOMMENDATIONS

15   _____/

16   I. <u>Introduction</u>

17           Plaintiff, a state prisoner proceeding without counsel, seeks relief pursuant to

18   42 U.S.C. § 1983.  This case is proceeding on the third amended complaint, filed September 27,

19   2010.  Plaintiff alleges that defendants were deliberately indifferent to plaintiff's serious medical

20   needs by refusing to prescribe nonformulary medications for his mental illness that previously

21   worked well for his mental health issues, and prescribing medications plaintiff contends were

22   more harmful to his liver.  On June 15, 2012, defendants Chambers, Fox, Francheschi, Kimura,

23   Livingston, Raniseski, Robinson, Rodriguez, and Wilson[1] plaintiff filed a motion for summary

24   judgment.  On July 20, 2012, plaintiff filed an opposition.  On August 27, 2012, pursuant to the

25   ─────────────────

26   [1] Defendant Dr. Evans was dismissed from this action on December 14, 2011.  (Dkt. No. 82.)

1  court's July 25, 2012 order, plaintiff filed a supplemental opposition.  On August 31, 2012,

2  defendants filed a reply.  As explained below, the court recommends that defendants' motions for

3  summary judgment be granted.

4  II.  Plaintiff's Allegations

5         Plaintiff is proceeding on the verified third amended complaint filed September

6  27, 2010, alleging that defendants were deliberately indifferent to plaintiff's serious medical

7  needs by refusing to prescribe nonformulary medications for his mental illness, and prescribing

8  medications plaintiff contends were more harmful to his liver because plaintiff had Hepatitis C.

9  (Dkt. No. 22.)  Plaintiff contends he was told that defendant Dr. Francheschi ordered defendant

10  Dr. Chambers and Dr. Evans to discontinue plaintiff's prior prescriptions, and prescribe plaintiff

11  medications under the new formulary.  (Dkt. No. 22 at 5.)  Plaintiff alleges that defendants Fox,

12  Kimura-Yip, Livingston, Raniseski, Robinson, Rodriguez, and Wilson failed to properly handle

13  plaintiff's administrative appeals concerning plaintiff's medications.  (Dkt. No. 22 at 2-5.)

14  III.  Defendants' Motion for Summary Judgment

15         Defendants move for summary judgment on multiple grounds.  First, to the extent

16  that plaintiff objects to the failure of defendants to include the medications he sought in the

17  formulary, or to the criteria for their nonformulary use, defendants contend plaintiff's claims

18  must be raised in Plata v. Brown, Case No. C-01-1351 THE (N.D. Cal.),  a class action of

19  inmates in California state prisons with serious medical needs.  Moreover, because the receiver in

20  Plata is responsible for determining the formulary and criteria for medications on a non-

21  formulary basis, defendants cannot be held liable for the receiver's decisions.  Finally, defendants

22  argue that although the receiver is an indispensable or necessary party under such allegations,

23  joinder is not feasible because the receiver is immune from damages.

24         Second, defendants contend plaintiff cannot state a deliberate indifference claim

25  based on a difference of opinion with doctors over the proper course of plaintiff's treatment.

26  ////

2

1          Third, defendants argue that plaintiff cannot state an Eighth Amendment

2 deliberate indifference claim or a Fourteenth Amendment due process claim against defendants

3 Chambers, Fox, Franceschi, Kimura-Yip, Livingston, Raniseski, Robinson, Rodriguez, and

4 Wilson for denying plaintiff's grievances about the medications ordered by plaintiff's treating

5 psychiatrists and physicians.

6          A.  Legal Standard for Summary Judgment

7          Summary judgment is appropriate when it is demonstrated that the standard set

8 forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if

9 the movant shows that there is no genuine dispute as to any material fact and the movant is

10 entitled to judgment as a matter of law. "  Fed. R. Civ. P. 56(a).[2]

11          Under summary judgment practice, the moving party always bears
the initial responsibility of informing the district court of the basis

12          for its motion, and identifying those portions of "the pleadings,
depositions, answers to interrogatories, and admissions on file,

13          together with the affidavits, if any," which it believes demonstrate
the absence of a genuine issue of material fact.

14

15 Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

16 56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

17 only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

18 Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

19 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

20 Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

21 burden of production may rely on a showing that a party who does have the trial burden cannot

22 produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

23 should be entered, after adequate time for discovery and upon motion, against a party who fails to

24

25        [2]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10,
2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule

26 56, "[t]he standard for granting summary judgment remains unchanged."

1   make a showing sufficient to establish the existence of an element essential to that party's case,

2   and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

3   "[A] complete failure of proof concerning an essential element of the nonmoving party's case

4   necessarily renders all other facts immaterial."  Id. at 323.

5           Consequently, if the moving party meets its initial responsibility, the burden then

6   shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

7   See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

8   to establish the existence of such a factual dispute, the opposing party may not rely upon the

9   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

10  form of affidavits, and/or admissible discovery material in support of its contention that such a

11  dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

12  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

13  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

14  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

15  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

16  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

17  1436 (9th Cir. 1987).

18          In the endeavor to establish the existence of a factual dispute, the opposing party

19  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

20  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

21  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

22  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

23  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

24  committee's note on 1963 amendments).

25          In resolving a summary judgment motion, the court examines the pleadings,

26  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

4

1   any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson,

2   477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the

3   court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587.

4   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

5   produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen

6   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

7   1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

8   show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

9   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

10  'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

11        By order filed July 25, 2012, the court advised plaintiff of the requirements for

12  opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt.

13  Nos. 92); see Rand, 154 F.3d at 957.

14        B. Undisputed Facts[3]

15        For purposes of the instant motion for summary judgment, the court finds the

16  following facts undisputed.

17        **Background**

18        1. Plaintiff William Thomas Coats is a California prisoner who has a history of

19  various mental illnesses, including Axis I amphetamine and polysubstance dependence, organic

20  brain syndrome with poor impulse control, paranoid schizophrenia, bipolar disorder, and

21  depression, as well as an Axis II antisocial personality disorder. (Dkt. No. 90-3 at 5.) Plaintiff is

22  also positive for the hepatitis C virus ("HCV") and has mixed genotypes 1a and 2b. (Id. at 16.)

23

---

24        [3] In his opposition, plaintiff did not specifically address the undisputed facts set forth by
      defendants. (Dkt. No. 93 at 14.) Rather, plaintiff addressed defendants' "summary of facts"
25  (dkt. no. 90-1 at 6-15), noting to which sections plaintiff would stipulate. (Dkt. No. 93 at 14.)
      However, most of defendants' "summary of facts" is based on the undisputed facts set forth by
26  defendants.

2.  Plaintiff was paroled in November 2005, with orders for Zoloft, sertraline, one tablet every morning for depression, and Seroquel (quetiapine), 200 mg., one tablet every evening, for 30 days, for bipolar disorder (manic depression); phenytoin, 100 mg., three tablets every evening, for 30 days for a seizure disorder; and Ranitidine, 150 mg., one tablet, b.i.d. (twice a day), for gastroesophageal reflux disease ("GERD"), a condition in which the stomach contents leak backwards from stomach to esophagus, causing heartburn and other symptoms. (Dkt. No. 90-3 at 5.)

3.  Plaintiff was discharged from parole in March of 2006.  (Dkt. No. 90-3 at 6.)

4.  In January 2007, the California Prison Health Care Receivership Corporation retained Maxor National Pharmacy Services Corporation to provide consulting services necessary to implement the court-approved remedial plan in Plata v. Schwarzenegger, et al., N.D. Cal. No. C01-1351 THE, by improving pharmacy services of the California Department of Corrections and Rehabilitation ("CDCR").  (Dkt. No. 90-6 at 5 (Pharmacy Management Consulting Services, 2009 Annual Report).)  A Pharmacy and Therapeutics Committee was established in February of 2007.  (Dkt. No. 90-6 at 20.)  That committee must approve the medications contained in the CDCR Drug Formulary.  (Dkt. Nos. 90-3 at 17 & 90-4 at 28-29.) The new CDCR formulary was approved in May of 2007.  (Dkt. No. 90-6 at 21.)  The May 2007 formulary is periodically updated.  (Dkt. No. 90-7 at 2-54.)

5.  Medications which were not in the formulary could be ordered if certain criteria were met and procedure followed.  (Dkt. Nos. 90-3 at 16-17 & 90-4 at 28-29.)[4]

**Plaintiff's Treatment at DVI - 12/12/2007 to 1/26/2009**

6.  Plaintiff was sentenced to a term of 40 years to life as a three-strike offender, and on December 12, 2007, was sent to Deuel Vocational Institution -- Reception Center ("DVI") from Sacramento County Jail.  (Dkt. No. 22 at 2.)

_____

[4] Documents attached to interrogatory responses are submitted as one complete set to defendants' Exhibit D.  (Dkt. No. 90-4 at 12-36.)

7.  A mental health transfer form from the jail provided no information on plaintiff's medical or mental health treatment during the time he was in jail, or his current diagnoses and medications.[5]  (Dkt. No. 90-3 at 6.)

8.  Plaintiff's CDCR health records from his prior incarceration were not immediately available because they had been placed in storage when he discharged from parole in March of 2006.  (Dkt. No. 90-3 at 6.)

9.  In the absence of medical records concerning plaintiff's current health care needs, DVI medical staff conducted an initial health care screening.  (Dkt. No. 90-3 at 6.) Plaintiff reported that he had been under a doctor's care for hepatitis C, sciatica, GERD, migraine headaches, and hypothyroidism.  (Id.)  Plaintiff reported that he had been diagnosed with hepatitis C in 2003 or 2004, but had not had a liver biopsy and did not want to take interferon because of his psychiatric medications.  (Id.)  Plaintiff reported that he had been treated with Vicodin for sciatica for twenty years after he injured his back when he fell after lifting a bundle of copper wire he was trying to steal.  (Id.)  Plaintiff said he had not had any medications for the previous 48 hours.  (Id.)

10.  As a new arrival, plaintiff was housed in the Administrative Segregation Unit at the reception center, and was screened prior to placement by a registered nurse, who noted that plaintiff did not have suicidal symptoms, and was not displaying any emergent mental health symptoms at that time, but that he reported not having had any medications for the last 48 hours. (Dkt. No. 90-3 at 6.)  He was referred to a psychiatrist for evaluation of his need for psychiatric medications.  (Id.)

---

[5]  Plaintiff disputes this fact, stating that on the day he was transferred from the jail, he asked the Deputy Sheriff transporting plaintiff to prison if the officer had plaintiff's medical and psych records to be given to prison medical personnel upon arrival.  (Dkt. No. 93 at 14.)  Plaintiff states that the Deputy Sheriff "assured" plaintiff that the records were going with plaintiff.  (Id.) However, plaintiff provided no declaration from the Deputy Sheriff attesting to what records accompanied plaintiff, and does not refer to a specific exhibit or exhibits that were allegedly provided to prison officials upon his arrival in 2007.  (Dkt. No. 93 at 1-14.)

1          11.  On December 13, 2007, Dr. Jansen, a psychiatrist, saw plaintiff and noted that

2  plaintiff's psychiatric records were not available.  (Dkt. No. 90-3 at 6.)  Dr. Jansen noted that

3  plaintiff reported that he got anxious, but Dr. Jansen noted that he did not have much else in the

4  way of symptoms at that time.  (Id.)  Dr. Jansen also noted that plaintiff wanted Wellbutrin.  (Id.)

5          12.  Wellbutrin is a drug used to treat the symptoms of an Axis I -- Major

6  Depressive Disorder, but it was deleted from the CDCR formulary in August 2007 by the

7  Pharmacy & Therapeutics Committee for safety reasons, including inmate hoarding, abuse, and

8  suicides.  (Dkt. No. 90-3 at 6.)  Wellbutrin, called "Wellbies" by inmates, is subject to abuse in a

9  correctional setting, and is of particular concern in patients like plaintiff who had a history of

10  polysubstance abuse.  (Dkt. Nos. 90-3 at 6-7 & 90-8 at 3-4.)  Wellbutrin has the potential to

11  cause seizures.  (Dkt. No. 90-5 at 20.)  Plaintiff had a history of seizures.  (Id.)

12          13.  Wellbutrin could be prescribed on a non-Formulary basis, if the patient met

13  the following criteria: 1) a documented history of an Axis I Major Depressive Disorder or

14  Attention Deficit Disorder; 2) documentation of the severity of the patient's impairment and how

15  it interfered with his ability to function or program in the correctional setting; 3) when requested

16  for a Major Depressive Disorder, a documented history that the patient had failed three

17  antidepressant therapies on other medications (i.e., selective serotonin reuptake inhibitors,

18  serotonin norepinephrine reuptake inhibitors, or Remeron (mirtazapine), at maximum tolerated

19  doses for a clinical trial period of no less than six to eight weeks, with blood levels obtained to

20  confirm compliance with the clinical trial; 4) when requested for ADHD, a documented history

21  of a failed trial of Straterra (amoxipine) approved for the treatment of ADHD at maximum

22  tolerated dose for a clinical trial of no less than six to eight weeks, with blood levels obtained to

23  confirm compliance with the clinical trial; 5) no documented history of institutional drug abuse

24  in the last two years; 6) no history of medication abuse or hoarding; 7) no history of seizure or

25  bulimia disorders; 8) Wellbutrin to be ordered as crushed and added to fluid, except for

26  Wellbutrin SR and XL); 9) no prescription of Wellbutrin SR and XL beyond the transition period

1  for Reception and Receiving; 10) patients on Wellbutrin, and not approved for continuation, to

2  be gradually tapered off medication as clinically indicated; and 11) immediate use of

3  non-formulary process, if prescribing doctor believed that there was a significant clinical basis

4  for continuation of Wellbutrin.  (Dkt. Nos. 90-3 at 7; 90-4 at 28-29; 90-8 at 3-4.)

5    14.  Dr. Jansen found that plaintiff did not meet the criteria for non-formulary use

6  of Wellbutrin because he was not diagnosed with an Axis I-Major Depressive Disorder or

7  Attention Deficit Disorder, and he had not failed on alternative medications available in the

8  Formulary.  (Dkt. No. 90-3 at 7.)  Dr. Jansen diagnosed an Axis I-Mood Disorder, NOS (not

9  otherwise specified), and ordered Seroquel, 800 mg., p.m. (in the evening) for 30 days.  (Id.)

10    15.  On December 18, 2007, the treatment team saw plaintiff, who reported a

11  history of bipolar disorder and schizophrenia, with multiple suicidal gestures or attempts, the last

12  of which were a hanging 17 years before and wrist cutting in 1992.  (Dkt. No. 90-3 at 8.)  The

13  treatment team placed plaintiff at the Correctional Clinical Case Management System

14  ("CCCMS") level of care, scheduled him for an appointment with a psychiatrist, and noted that

15  he would be seen weekly while in administrative segregation and again by the treatment team in

16  late December 2007, when he would be considered for the Enhanced Outpatient Program

17  ("EOP") level of care.  (Id.)

18    16.  The following day, December 19, 2007, Dr. Faggianelli, a clinical

19  psychologist, noted that a classification committee had decided to move plaintiff to protective

20  custody in the Special Processing Unit ("SPU") because plaintiff had expressed concerns that his

21  safety was at risk from inmates in certain gangs.  (Dkt. No. 90-3 at 8.)  After conferring with Dr.

22  Williams, Dr. Faggianelli decided that plaintiff should be seen weekly for group sessions in the

23  SPU because of his suicide risk factors and reported depressed mood.  (Id.)  Because plaintiff

24  would only be seen monthly in the SPU if he remained at the CCCMS level of care, Dr.

25  Faggianelli decided to move plaintiff to the EOP level of care so he could be seen more

26  ////

1   frequently and notified Dr. Franceschi, the Coordinator for the EOP program in the SPU.  (Id.)

2   Dr. Franceschi could not order psychiatric medications as a psychologist.  (Dkt. No. 90-3 at 15.)

3          17.  On December 21, 2007, a correctional officer in plaintiff's housing unit asked

4   Dr. Sasser, a clinical psychologist, to see plaintiff, because plaintiff reported increased anxiety.

5   (Dkt. No. 90-3 at 8.) Dr. Sasser noted that plaintiff had been taking psychiatric medications to

6   manage his mood and anxiety, and that he was currently on Seroquel.  (Id.)  Dr. Sasser referred

7   him to Dr. Chambers, a psychiatrist, for a medication evaluation.  (Dkt. No. 90-3 at 8-9.)  Later

8   that day, Dr. Chambers renewed plaintiff's order for Seroquel, 800 mg., in the evening, and

9   added Trileptal (oxcarbazapine), 300 mg., b.i.d. (twice a day) for one week, then increase to 600

10  mg., b.i.d., for 90 days.  (Dkt. No. 90-3 at 9.)  Dr. Chambers ordered Seroquel, a mood

11  stabilizer/antipsychotic, for plaintiff's psychosis and mood disorder, and Trileptal to reduce

12  plaintiff's anger and agitation.  (Dkt. No. 90-8 at 4.)

13          18.  On December 23, 2007, plaintiff asked to see a psychologist, stating that he

14  was "crazy" and "staff assaultive."  (Dkt. No. 90-3 at 9.)  Dr. Katz, a clinical psychologist, who

15  was plaintiff's Clinical Case Manager ("CCM"), saw him the next day and noted that plaintiff

16  complained that he was not receiving his medications on a regular basis.  (Id.)  Dr. Katz noted

17  that plaintiff had been given Seroquel the previous evening, and that he would talk with Dr.

18  Chambers about his medications.  (Id.)  Dr. Chambers saw plaintiff later that day.  (Id.)  Plaintiff

19  said he was anxious, had mood swings, but did not have suicidal ideation, hallucinations, or

20  delusions.  (Id.)  Plaintiff claimed that he had not gotten Seroquel the previous two nights, and

21  that he had a history of taking Wellbutrin (buproprion), Klonopin, Lexapro, Trazodone, and

22  Seroquel, before he was incarcerated.  (Id.)  Dr. Chambers noted plaintiff's history of

23  amphetamine dependence and auditory hallucinations, when not on medication.  (Id.)  Dr.

24  Chambers concluded that plaintiff had a Mood/Psychotic Disorder, NOS, by history and ordered

25  Seroquel, 800 mg. in the evening, to stabilize plaintiff's mood and to treat the auditory

26  hallucinations and Trileptal tapered to 600 mg., b.i.d., for one week, to treat plaintiff's anger and

1   agitation issues.  (Id.; Dkt. No. 90-8 at 4.)

2          19.  On December 26, 2007, Dr. Carey, a clinical psychologist, saw plaintiff in an

3   EOP group on coping skills.  (Dkt. No. 90-3 at 9.)  Dr. Carey noted that plaintiff was angry about

4   medication issues and might lash out in the future, if he did not get the medications he wanted.

5   (Id.)

6          20.  The following day, December 27, 2007, Dr. Valassopoulos, another clinical

7   psychologist, saw plaintiff in an anger management group.  (Dkt. No. 90-3 at 9.)  Plaintiff again

8   complained about his medications.  (Id.)  The same day, plaintiff told a physician that he had

9   been on a lot of medications and knew about the risks of diabetes, weight gain, and blood

10  problems with Seroquel, and wanted to give the Trileptal a chance.  (Dkt. No. 90-3 at 9-10.)  The

11  physician noted that plaintiff had seen recently by the psychiatrist and should be continued on the

12  Seroquel and Trileptal that had been prescribed.  (Dkt. No. 90-3 at 10.)

13         21.  On December 28, 2007, a treatment team noted that plaintiff was on Seroquel,

14  which was helping stabilize his moods; that he was functioning and coping fairly well at that

15  time; that he had no suicide attempts in the last six months.  (Dkt. No. 90-3 at 10.)  The treatment

16  team noted that plaintiff had an Axis I Substance-Induced Mood Disorder and Amphetamine

17  Dependence and hepatitis C for which he was not on medication at that time, and that he could

18  be maintained at the CCCMS level of care and did not meet the criteria of the EOP level of care

19  at that time.  (Id.)

20         22.  Three days later, on December 31, 2007, plaintiff complained about his

21  removal from the EOP level of care.  (Dkt. No. 90-3 at 10.)  He was seen by Dr. Sasser, a clinical

22  psychologist, who noted that plaintiff did not have suicidal or hallucinatory ideation, but that he

23  was upset and anxious about not being accepted for the EOP by the treatment team.  (Id.)

24  Plaintiff asked to see a psychiatrist for further evaluation for the EOP level of care.  (Id.)  Dr.

25  Sasser talked with plaintiff about the process for assigning levels of care, clarified the role of the

26  psychiatrist in that process, and encouraged plaintiff to discuss his concerns with the psychiatrist.

1   (Id.)  The treatment plan was for plaintiff to see a psychiatrist within the next three weeks and to

2   continue monthly contacts with his CCM.  (Id.)

3          23.   On January 2, 2008, plaintiff received a physical examination by a physician.

4   (Dkt. No. 90-3 at 10.)  Plaintiff reported that he had numerous problems, including intravenous

5   use of methamphetamines, chronic anxiety, paranoid schizophrenia, migraine headaches,

6   hypothyroidism, seizures, hepatitis C, GERD, obesity, sciatica, and degenerative joint disease

7   ("DJD").  (Id.)  Plaintiff claimed he had been taking Klonopin (Clonazepam).  (Id.)  Klonopin is

8   a drug used to treat certain kinds of seizures, but also is sometimes used to treat panic attacks.

9   (Id.)  The physician decided to order diagnostic blood work for the thyroid and seizure problems

10  and a hepatitis panel.  (Id.)  The doctor also ordered medications, including Imitrex

11  (Sumatriptan), for the onset of migraines; Robaxin (Methocarbamol) and Motrin (Ibuprofen) for

12  pain; Zantac (Ranitidine) for GERD; and an egg crate mattress and low tier/bunk housing

13  chronos.  (Dkt. No. 90-3 at 10-11.)  Klonopin was not in the CDCR Formulary, and physicians

14  ordered Dilantin for seizures.  (Dkt. No. 90-5 at 20-21.)  Klonopin has a high risk of addiction

15  and is especially risky for a patient like plaintiff with a history of amphetamine abuse.  (Dkt. No.

16  90-8 at 5.)

17         24.   On January 4, 2008, plaintiff complained to Dr. Sasser, who was seeing other

18  patients at their cells, that no one was helping him.  (Dkt. No. 90-3 at 11.)  Dr. Sasser noted that

19  plaintiff was frustrated about not being accepted into the EOP level of care and referred him to

20  Dr. Franceschi for further evaluation.  (Id.)

21         25.   On January 8, 2008, a physician saw plaintiff and noted that he had

22  hypothyroidism (insufficient production of thyroid hormone), GERD, and that he was positive

23  for the HCV.  (Dkt. No. 90-3 at 11.)  Plaintiff was to be seen in two weeks after lab results were

24  obtained.  (Id.)  A liver panel, including liver enzyme tests for alanine aminotranferease ("ALT")

25  and aspartate aminotransferase ("AST"), were normal.  (Id.)  AST and ALT are considered to be

26  two of the most important tests to detect liver injury.  (Id.)  ALT and AST can be used to monitor

people who are taking medications that are potentially toxic to the liver.  (Id.)  Markedly

increased levels of ALT may be the result of exposure to drugs that are toxic to the liver.  (Id.)

Plaintiff had repeated liver enzyme tests; his ALT levels were normal, and he had no other signs

or symptoms of cirrhosis or end-stage liver disease.  (Dkt. Nos. 90-4 at 43-44 & 90-5 at 21-22.)

26.  Dr. Katz also saw plaintiff on January 8, 2008, and noted that he showed no

signs of distress, overt signs of agitation, or suicidal ideation.  (Dkt. No. 90-3 at 11.)  Dr. Katz

noted that plaintiff would be continued on the medications prescribed by the psychiatrist and at

the CCCMS level of care.  (Id.)

27.  On January 9, 2008, Dr. Chambers saw plaintiff in a treatment team session

and noted that he continued to feel angry and wanted to be given Wellbutrin and Klonopin and

moved to the EOP level of care.  (Dkt. No. 90-3 at 11.)  Plaintiff said he continued to experience

intermittent auditory hallucinations and that he had been off his medications when on parole and

using amphetamines.  (Id.)  Dr. Chambers noted that plaintiff was alert and oriented, spoke

without evidence of psychosis, but was irritable and had occasional suicidal ideation, without a

plan.  (Id.)  Dr. Chambers diagnosed a Mood/Psychotic Disorder, NOS, renewed the order for

Seroquel, and increased the dose of Trileptal to 900 mg., b.i.d.  (Id.)

28.  Later that day, plaintiff complained to Dr. Sasser that the treatment team had

decided not to move him to the EOP level of care.  (Dkt. No. 90-3 at 11-12.)  Dr. Sasser referred

him to Dr. Katz, his CCM.  (Dkt. No. 90-3 at 12.)  Dr. Katz said that he would see plaintiff after

he finished a session with another inmate.  (Id.)  About a half hour later, a correctional officer

saw plaintiff putting his head in a noose as the officer walked by his cell.  (Id.)  Dr. Carey,

another psychologist, then saw plaintiff who said:  "Here's how it's going to work:  Either you

make me EOP or I'm going to do violence to myself or someone else."  (Id.)  Plaintiff told Dr.

Carey, "Fuck you," and again threatened violence toward himself or to others when he went to

"chow."  (Id.)  Plaintiff said that he was "going to have to do something violent to get attention,"

that he would kill himself and "stick a knife in his neck;" and that the next time, it would be

1   "homicide" if he didn't get what he wanted.  (Id.)  Plaintiff then said that "when he got where he

2   was going, he would take himself out with some heroin."  (Id.)  Dr. Carey noted that plaintiff's

3   mood was hostile and angry, but without evidence of psychosis, and that he might be

4   manipulating or a real suicide risk when he got to his next institution.  (Id.)  Dr. Carey

5   recommended that plaintiff be admitted to the Outside Housing Unit ("OHU"), which is the

6   infirmary at the reception center, because he was a high risk for violence to others, and a

7   moderate risk of violence to self.  (Id.)  About an hour and a half later, Dr. Katz noted that

8   plaintiff was quite agitated and had said: "Give me EOP and my meds.  I was suicidal this time.

9   Next time I will be homicidal."  (Id.)  Dr. Katz noted that plaintiff said he wanted to "kill Dr.

10  Franceschi" and any other psychologist who did not get him his desired medications.  (Id.)

11  Plaintiff demanded to be taken immediately to the OHU located on B Wing.  (Id.)  Dr. Chambers

12  then ordered plaintiff admitted to the OHU for suicide watch because he was a danger to himself

13  or others.  (Id.)

14          29.  Dr. Bunn, a psychiatrist, and Dr. Hamon, a clinical psychologist, saw plaintiff

15  on January 10, 2008.[6]  (Dkt. No. 90-3 at 11.)  Plaintiff said that he needed to either get on his

16  medications or be placed in the EOP level of care and that he had made a rope, tied it around his

17  neck, and hung it around the top bunk, but had made it so that his feet would touch the floor.

18  (Id.)  Plaintiff said he was just trying to get to the EOP level of care because that was the only

19  way he could get to New Folsom prison, where his brother was housed.  (Dkt. No. 90-3 at 11-

20  12.)  Plaintiff said he was not suicidal anymore and asked to be returned to his housing unit.

21  (Dkt. No. 90-3 at 12.)  Dr. Bunn's diagnosis was that plaintiff had Axis I-Psychosis NOS and

22  Polysubstance Abuse and that feigning of symptoms need to be ruled out.  (Id.)  He referred

23  plaintiff to a mental health crisis treatment bed because of the recent suicide attempt and to start

24  treating him with Seroquel, 200 mg. in the evening.  (Id.)  Dr. Bunn noted that plaintiff was

25
26          [6]  Although Dr. Franceschi's answer to interrogatory number 8 recites the date as January
    10, 2007 (dkt. no. 90-3 at 12:24-25), the 2007 appears to be a typographical error.

drug-seeking and wanted Wellbutrin.  (Id.)

30.  The same day, January 10, 2008, Dr. Franceschi prepared an updated mental health treatment plan for plaintiff, noting that plaintiff had been hostile and agitated during his session that day, and that his main complaint focused on the medications that had been ordered. (Dkt. No. 90-3 at 13.)  Dr. Franceschi noted that plaintiff wanted psychiatric medications that were often abused in prison, but which DVI psychiatrists had not prescribed.  (Id.)  Plaintiff stated he needed those medications and would become aggressive if he did not get them.  (Id.) Dr. Franceschi noted that the few psychiatric symptoms plaintiff described were vague and did not seem genuine, and that his suicide history was mostly gestures, with the last attempt being 14 years ago.  (Id.)  Plaintiff stormed out of the session when told he would be placed at the CCCMS level of care.  (Id.)

31.  On January 11, 2008, plaintiff was seen by Dr. Jansen, a psychiatrist, and Dr. Hall, a clinical psychologist.  (Dkt. No. 90-3 at 13.)  Dr. Jansen increased plaintiff's Seroquel dose to 400 mg., but made no other changes in his medications.  (Id.)

32.  On January 12, 2008, Dr. Ozden, a psychiatrist, saw plaintiff who complained about not getting Wellbutrin and Klonopin, and that his Seroquel dose should be 800 mg., rather than the 400 mg. that had been ordered.  Plaintiff claimed that those were the medications that worked best for his problems.  (Dkt. No. 90-3 at 13.)  Dr. Ozden found that plaintiff likely had an Axis I-Bipolar Disorder.  (Id.)  Dr. Ozden did not provide the increased dose of Seroquel, but continued it at 400 mg., in the evening, and he did not order the other medications plaintiff had requested.  (Id.)

33.  On January 13, 2008, Dr. Ozden and Dr. Hall saw plaintiff again.  (Dkt. No. 90-3 at 13.)  Plaintiff complained that he was depressed and still wanted Wellbutrin, but agreed to take Celexa (citalopram hydrochloride), another antidepressant medication.  (Id.)  Celexa is similar to Lexapro (escitalopram oxalate), an antidepressant that plaintiff had requested and claimed to have taken when in the community.  (Dkt. No. 90-3 at 13-14.)  Celexa, which was

available in a generic form, was in the CDCR formulary; Lexapro, which was only available under its brand name, was not. (Dkt. No. 90-3 at 14.) Dr. Ozden diagnosed Axis I-Bipolar Disorder, NOS, increased the dose of Seroquel to 500 mg. in the evening, and added Celexa, 20 mg. in the morning. (Id.) When Dr. Hall saw plaintiff later that day, plaintiff said he had hepatitis C and was having liver pain and damage, as well as hypothyroidism. (Id.) Dr. Hall discussed plaintiff's concerns and medications. (Id.)

34. On January 14, 2008, Dr. Hall noted that plaintiff was not currently suicidal and could be discharged from the OHU on Seroquel and Celexa, with a five-day follow-up with mental health staff. (Dkt. No. 90-3 at 14.) Plaintiff voiced concerns about his hepatitis C and hypothyroidism and said he wanted to stay on Seroquel and would accept the risks of diabetes. (Id.) When plaintiff discharged from the OHU, he went back to administrative segregation, where he was followed on a five-day suicide watch. (Id.)

35. On February 6, 2008, Dr. Franceschi updated plaintiff's mental health treatment plan, noting that he was diagnosed as Psychotic, NOS, was on Seroquel, 400 mg. and citalopram (Celexa), 20 mg. at the time, was at the EOP level of care in administrative segregation, and that he would be seen by the SPU treatment team upon his release from administrative segregation. (Dkt. No. 90-3 at 14.)

36. On February 19, 2008, plaintiff was placed on suicide watch because he told officers his wife was dying of liver disease and his time to appeal his life sentence would expire that night before he could file with the court. (Dkt. No. 90-3 at 14.) Dr. Bunn saw plaintiff the next day and noted that plaintiff was having difficulty with custody staff because he felt patronized and ignored by them about filing an appeal of his criminal sentence. (Id.) Dr. Bunn noted that plaintiff mentioned suicide, but had no suicidal ideation. (Id.) Plaintiff reported that the Celexa was not working, so Dr. Bunn discontinued that medication and increased Seroquel to 800 mg., every evening, for 30 days. (Id.) Plaintiff stated he had just been trying to get help from his CCM and officers about his concerns, and that he was not suicidal. (Id.) Plaintiff was

16

1   discharged that day from the OHU.  (Id.)

2          37.  On February 22, 2008, Dr. Williams saw plaintiff and noted that he was

3   calmer and had better impulse control and that a referral to a higher level of care was not

4   indicated at that time.  (Dkt. No. 90-3 at 14.)  The plan was to continue plaintiff on weekly

5   contacts with his CCM, to check his psychological functioning, and to schedule him to see a

6   psychiatrist for medication review in a week.  (Dkt. No. 90-3 at 15.)

7          38.  On February 29, 2008, Dr. Jansen saw plaintiff for follow-up and noted that

8   plaintiff was still depressed, but not suicidal.  (Dkt. No. 90-3 at 15.)  Plaintiff asked for

9   Wellbutrin and Sinequan (doxepin), a tricyclic antidepressant, stating they had worked for him in

10  the past.  (Id.)  Wellbutrin and Sinequan were not in the CDCR Formulary.  (Id.)  Dr. Jansen

11  diagnosed Psychotic Disorder, NOS, and ordered Seroquel, 800 mg. in the evening and Effexor

12  (venlafaxine), an antidepressant, which were in the CDCR Formulary.  (Id.)

13         39.  On May 18, 2008, plaintiff submitted a grievance in Log. No. DVI-08-1570,

14  asking that orders be issued for psychotropic medications he claimed to have been given while on

15  parole (Wellbutrin, Klonopin, Lexapro, Trazodone, and Seroquel).  (Dkt. Nos. 90-3 at 25-26, 27-

16  28 & 90-4 at 12.)

17         40.  On May 27, 2008, Staff Services Analyst Wilson reviewed plaintiff's

18  grievance, identified Dr. Evans as a psychiatrist who could respond to the issues raised, and

19  scheduled plaintiff to see Dr. Evans on June 5, 2008.  (Dkt. Nos. 90-3 at 25-26, 27-28 & 90-4 at

20  12.)  Wilson was not a psychiatric nurse.  (Dkt. No. 90-3 at 28.)  Wilson's role was

21  administrative, and she had no authority to grant or deny plaintiff's request for particular

22  psychotropic medications, which had to be done by a treating psychiatrist.  (Dkt. Nos. 90-3 at 25-

23  26, 27-28 & 90-4 at 12.)

24         41.  On June 5, 2008, Dr. Evans denied the grievance at the informal level, and

25  plaintiff appealed, asking that the medications be prescribed on a non-formulary basis.  (Dkt. No.

26  90-4 at 12.)

1        42.   In May and June 2008, Dr. Chambers prescribed Trazodone to plaintiff to

2    help him sleep.  (Dkt. No. 90-8 at 5.)  When that medication was moved to non-formulary status

3    in June 2008, Dr. Chambers found that plaintiff did not meet the criteria for a confirmed

4    prescription for Trazodone, as other medication would be equally effective to help him sleep.

5    (Id.)

6        43.   When Seroquel was moved to non-formulary status, psychiatrists were

7    required to taper patients off that medication by June 30, 2008.  (Dkt. No. 90-8 at 4.)  Dr.

8    Chambers explained that to plaintiff who objected.  (Id.)  Plaintiff remained on Seroquel until his

9    prescription was discontinued.  (Id.)  When plaintiff reported that he was still hearing voices, Dr.

10   Chambers instead prescribed Ziprasidone (Geodon), another a mood stabilizer/antipsychotic, to

11   help him with his psychosis.  (Id.)  Dr. Chambers later switched plaintiff from Geodon to

12   Risperidone, another mood stabilizer/antipsychotic.  (Dkt. No. 90-8 at 4-5.)  Geodon and

13   Risperidone are as effective as Seroquel in treating psychosis and mood disorder, and were

14   appropriate for plaintiff's symptoms.  (Dkt. No. 90-8 at 5.)

15       44.   On July 11, 2008, Dr. Chambers interviewed plaintiff concerning the

16   grievance at the first level and provided a response to Health Program Specialist Rodriguez who

17   could not order or discontinue medication, but who wrote down the response on the inmate

18   appeal form.  (Dkt. Nos. 90-3 at 38, 39, 41 & 90-4 at 13.)  The written response stated:

19           Wellbutrin is now a non-formulary medication per the "new
             standardized CDCR statewide Pharmacy and Therapeutics."  This
20           was discussed with you.  The decision to change the use of this
             medication was made for safety issues.  There are several criteria
21           that must be met before this medication will be prescribed.  Your
             case does not meet the criteria.  Adjustments were made to your
22           current psychotropic medications.

23   (Id.)  On July 15, 2008, Dr. Raniseski, the Chief Psychologist at DVI, approved that response,

24   relying on Dr. Chambers' judgment.  (Dkt. No. 90-4 at 3, 4-5, 7, 8, 13.)  Dr. Raniseski could not

25   order medications himself because he was not a psychiatrist.  (Id.)  In Dr. Chambers' medical

26   judgment, plaintiff did not meet the criteria for non-formulary use of Wellbutrin, and there were

18

other medication options, which were equally effective to treat plaintiff's condition, and which did not carry the abuse potential that Wellbutrin did. (Dkt. No. 90-8 at 3-4.) Moreover, Wellbutrin was seen as contraband, which presented the risk that other inmates would try to use intimidation to steal Wellbutrin from those in possession of the prescription. (Id.) Dr. Chambers provided a thorough explanation to plaintiff of the reasons he was not prescribed Wellbutrin when he met him to respond to the grievance. (Id.)

45. Plaintiff appealed to the second level where the grievance was partially granted by Dr. Coppola, the Chief of Mental Health at DVI, on August 26, 2008.[7] (Dkt. Nos. 90-4 at 41-42 & 90-4 at 13 (appeal).) Dr. Coppola stated that plaintiff had 22 mental health contacts in the preceding three months, that he was at the CCCMS level of care, that he was receiving mental health care that exceeded the standard of care, and that plaintiff was receiving some of the medications he had previously received, and that the medications he was receiving were prescribed based on his diagnosis and treatment needs. (Dkt. No. 90-4 at 19.) Dr. Coppola stated that there were many approaches to treatment, which included multiple medication options that are equally effective for the symptoms of mental disorders. (Id.) Dr. Fox, the Chief Medical Officer (Acting) approved Dr. Coppola's response. (Dkt. No. 90-4 at 13.) Dr. Fox was a physician. (Dkt. No. 90-4 at 41.) He did not diagnose mental illness and prescribe psychotropic medications. (Id. at 42-43.)

46. Plaintiff appealed to the Director's Level, claiming that he had been switched to Remeron and Risperidone, and Cogentin, which were destroying his liver. (Dkt. No. 90-4 at 13, 43-44.) To the extent that plaintiff was complaining that the psychotropic medications were toxic to his liver because he had hepatitis C, there was no evidence to support that belief. (Dkt. No. 90-4 at 43.) Plaintiff had repeated tests for ALT elevations, which would indicate liver

---

[7] Dr. Fox declares that Dr. Coppola addressed the concerns raised in the appeal, and then signed it on September 2, 2008. (Dkt. No. 90-4 at 41.) However, the appeal form notes August 26, 2008, as the date completed by Dr. Coppola, and his supplemental page is also dated August 26, 2008. (Dkt. No. 90-4 at 13, 19.)

1   damage.  (Id. at 44.)  Plaintiff's ALT tests were normal, as were his AFP tests for liver cancer

2   and a liver ultrasound.  (Id.)  Plaintiff showed no signs of cirrhosis or end-stage liver disease.

3   (Id.)  HCV viral loads do not correlate with liver damage, the severity of hepatitis C, or a poor

4   prognosis.  (Id.)  Viral loads only correlate with the likelihood of a sustained viral response

5   (SVR) to antiviral therapy with pegylated interferon and ribavirin.  (Id.; Dkt. No. 90-8 at 5.)

6           47.  Registered Nurse and Nurse Consultant Livingston and Dr. Robinson

7   reviewed plaintiff's grievance at the Director's Level.  (Dkt. No. 90-5 at 4; 90-4 at 22; & 90-5 at

8   17.)  The appeal was denied by Dr. Robinson, who signed for Associate Director Kimura-Yip.

9   (Dkt. No. 90-5 at 31 & 90-4 at 26.)  Kimura-Yip does not have a medical or psychiatric license.

10  (Dkt. No. 90-5 at 37.)  Dr. Robinson is a physician and relied on the judgment of plaintiff's

11  treating psychiatrists with respect to plaintiff's mental health medications, and medication

12  criteria for nonformulary prescriptions established by the P & T Committee.  (Dkt. No. 90-5 at

13  17, 18-19, 23-24.)

14          48.  Each of the five drugs plaintiff wanted when he arrived at DVI were known to

15  be drugs of abuse, particularly in a prison setting.  (Dkt. Nos. 90-5 at 19 & 90-8 at 3-5.)

16          49.  Seroquel is an atypical antipsychotic used to treat schizophrenia or acute

17  episodes of bipolar disorder, and as an augmenter for maintenance treatment of depression or

18  bipolar disorder.  (Dkt. No. 90-5 at 19.)  Psychiatrists did order Seroquel for plaintiff from

19  December 28, 2007, to June 30, 2008, when that drug was removed from the CDCR formulary,

20  and was only available on a non-formulary basis, if a patient met certain criteria.  (Id.)  Plaintiff's

21  treating psychiatrist did not find that he met those criteria and prescribed alternative medication

22  for his bipolar disorder that were available in the CDCR formulary.  (Id.)  Seroquel poses an

23  increased risk of obesity and glucose intolerance, particularly to patients at risk for diabetes.  (Id.)

24  Plaintiff was obese and at risk for diabetes.  (Id.)

25          50.  Wellbutrin is an antidepressant in the dopamine and norepinephrine reuptake

26  inhibitor class.  (Dkt. No. 90-5 at 20.)  Plaintiff was not prescribed Wellbutrin because that drug

had been removed from the CDCR formulary before he arrived at DVI, and it was only available on a non-formulary basis, if a patient met certain criteria. Plaintiff's treating psychiatrist did not find that he met those criteria and prescribed alternative medication for his bipolar disorder that were available in the CDCR formulary. (Id.; Dkt. No. 90-8 at 3-4.) Wellbutrin has the potential to cause seizures, is a drug of abuse in correctional settings, and is associated with suicides. (Id.) Plaintiff had a history of seizures and polysubstance abuse. (Id.)

51. Lexapro is an antidepressant, which is an updated formulation of Celexa. (Dkt. No. 90-5 at 20.) It is only available under its brand name, while Celexa is available in generic form. (Id.) Plaintiff was not prescribed Lexapro because that drug was not in the CDCR formulary. (Id.) Instead, psychiatrists at DVI ordered Celexa, or other antidepressants that were available in the CDCR Formulary. (Id.)

52. Trazodone is an antidepressant in the serotin antagonist and reuptake inhibitor (SARI) class. (Dkt. No. 90-5 at 20.) Psychiatrists ordered Trazodone in May and June 2008, but that drug was deleted from the CDCR formulary in June 2008, with a 90-day transition period which expired September 18, 2008. (Id.) After that date, Trazodone could only be prescribed on a non-formulary basis, if a patient met certain criteria. (Id.) Plaintiff's treating psychiatrist did not find that he met those criteria, and prescribed alternative medication for plaintiff's bipolar disorder that were available in the CDCR formulary. (Id.) Trazodone carries an increased risk of seizures, when taken with other seizure medications, like Dilantin. (Id.) Plaintiff was prescribed Dilantin for seizures. (Id.)

53. Klonopin is a Benzodiazepine used to treat seizures, but it is not a first-line drug used for the long-term treatment of seizures. (Dkt. No. 90-5 at 20-21.) It can also be used as a tranquilizer to treat panic attacks, but his treating psychiatrists did not find that it was indicated for plaintiff's mental health problems. (Dkt. Nos. 90-8 at 5 & 90-3 at 13.) Klonopin carries an increased risk of suicide and sedating effects in patients who are also taking antidepressants, like plaintiff. (Dkt. No. 90-5 at 20-21.) It also carries a high risk of addiction

and was especially risky in plaintiff's case because of his history of amphetamine abuse.  (Dkt. No. 90-8 at 5.)  Klonopin was not in the CDCR Formulary.  (Dkt. No. 90-5 at 20-21.)  Dr. Chambers did not find that Klonopin was medically indicated for plaintiff's presenting symptoms, and did not prescribe it.  (Dkt. No. 90-8 at 11.)  Doctors instead ordered Dilantin for treatment of plaintiff's seizures.  (Dkt. No. 90-5 at 20-21.)

54.  Vicodin, another drug requested by plaintiff for pain complaints was also not in the CDCR Formulary, and the U.S. Food and Drug Administration recommended its removal from the market in 2009 because of its high likelihood for liver damage from its acetaminophen component.  (Dkt. No. 90-5 at 21.)  Other pain medications were ordered for plaintiff.  (Id.)

55.[8]  The choice of psychiatric medications has no influence or bearing on the status of plaintiff's HCV, including viral loads, and tests showed no liver damage as a result of his treating psychiatrists' choice of medications to treat his mental illness.  (Dkt. No. 90-5 at 21-22.)  All psychotropic medications are relatively benign on a patient's liver.  (Dkt. No. 90-8 at 5.)  Plaintiff was diagnosed with HCV in 2004, long before Dr. Chambers' treatment of him began in 2007, and that treatment did not cause or contribute to that disease or its effect on his liver.  (Dkt. No. 90-8 at 5.)

56.  After plaintiff left DVI, he was treated for HCV with pegylated interferon and ribavirin, but he stopped treatment because he thought that sores in his mouth and on his buttocks were side effects caused by the medications.  (Dkt. No. 90-5 at 24.)  His treating doctors found that the mouth sores were bacterial and that the buttock sore was caused by a staph infection, and treated them with medications.  (Id.)  In early October 2009, plaintiff refused further treatment of his HCV with pegylated interferon and ribavirin because of the infections, and told staff he would start taking the antiviral therapy again when the infections were "cleared up" and "under

---

[8]  In connection with undisputed facts 55 and 56, plaintiff disputes the conclusions of Dr. Robinson and Dr. Chambers.  (Dkt. No. 93 at 14:11-12.)  However, plaintiff cites to no evidence in the record to support his view that these conclusions are incorrect, and provided no medical opinion rebutting the medical opinions of Dr. Robinson or Dr. Chambers.

control." (Dkt. No. 90-5 at 25.)  Plaintiff was told that he could not suspend and then re-start the therapy whenever he wanted.  (Id.)  Plaintiff then signed a refusal of further treatment.  (Id.)  He was noted to still have detectable HCV in early November 2009, which meant that he had not achieved a sustained viral response at the time he stopped treatment.  (Id.)  A week later, plaintiff told staff that he had also stopped taking medications prescribed for hyperthyroidism and hypertension because he thought that doing so might also help him get rid of his infections.  (Id.)

C.  Legal Standards

Generally, deliberate indifference to a serious medical need presents a cognizable claim for a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  According to Farmer v. Brennan, 511 U.S. 825, 847 (1994), "deliberate indifference" to a serious medical need exists "if [the prison official] knows that [the] inmate [ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  The deliberate indifference standard "is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'"  McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).  Specifically, a determination of "deliberate indifference" involves two elements:  (1) the seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to those needs.  McGuckin, 974 F.2d at 1059.

First, a "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."  Id. (citing Estelle, 429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need for medical attention include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that

significantly affects an individual's daily activities; or the existence of chronic and substantial

pain. McGuckin, 974 F.2d at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41

(9th Cir. 1990)).

Second, the nature of a defendant's responses must be such that the defendant

purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for

"deliberate indifference" to be established. McGuckin, 974 F.2d at 1060. Deliberate

indifference may occur when prison officials deny, delay, or intentionally interfere with medical

treatment, or may be shown by the way in which prison physicians provide medical care."

Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988). In order for deliberate

indifference to be established, there must first be a purposeful act or failure to act on the part of

the defendant and resulting harm. See McGuckin, 974 F.2d at 1060. "A defendant must

purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for

deliberate indifference to be established." Id. Second, there must be a resulting harm from the

defendant's activities. Id. The needless suffering of pain may be sufficient to demonstrate

further harm. Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

In applying this standard, the Ninth Circuit has held that before it can be said that

a prisoner's civil rights have been abridged, "the indifference to his medical needs must be

substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this

cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing

Estelle, 429 U.S. at 105-06.) A complaint that a physician has been negligent in diagnosing or

treating a medical condition does not state a valid claim of medical mistreatment under the

Eighth Amendment. Even gross negligence is insufficient to establish deliberate indifference to

serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990). A

difference of opinion between medical professionals concerning the appropriate course of

treatment generally does not amount to deliberate indifference to serious medical needs. Toguchi

v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.

1989).  Also, "a difference of opinion between a prisoner-patient and prison medical authorities

regarding treatment does not give rise to a[§ ]1983 claim."  Franklin v. Oregon, 662 F.2d 1337,

1344 (9th Cir. 1981).  To establish that such a difference of opinion amounted to deliberate

indifference, the prisoner "must show that the course of treatment the doctors chose was

medically unacceptable under the circumstances" and "that they chose this course in conscious

disregard of an excessive risk to [the prisoner's] health."  See Jackson v. McIntosh, 90 F.3d 330,

332 (9th Cir. 1996); see also Wilhelm v. Rotman, 680 F.3d 1113, 1123 (9th Cir. 2012) (doctor's

awareness of need for treatment followed by his unnecessary delay in implementing the

prescribed treatment sufficient to plead deliberate indifference); see also Snow v. McDaniel, 681

F.3d 978, 988 (9th Cir. 2012) (decision of non-treating, non-specialist physicians to repeatedly

deny recommended surgical treatment may be medically unacceptable under all the

circumstances.)  However, a physician need not fail to treat an inmate altogether in order to

violate that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314

(9th Cir. 1989).  A failure to competently treat a serious medical condition, even if some

treatment is prescribed, may constitute deliberate indifference in a particular case.  Id.

        In order to defeat the motion for summary judgment, plaintiff must "produce at

least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809 F.2d at 630,

that defendants' actions, or failures to act, were "in conscious disregard of an excessive risk to

plaintiff's health," Jackson, 90 F.3d at 332 (citing Farmer, 511 U.S. at 837).

        D.  Analysis

        In his initial verified opposition, plaintiff denies defendants are entitled to

summary judgment, and, without explanation, relies on Harvey v. Jordan, 605 F.3d 681 (9th Cir.

2010.) (Dkt. No. 91.)  Defendants contend that Harvey is inapposite, and this court agrees.

        In Harvey, the court addressed a motion to dismiss for failure to exhaust

administrative remedies, and held that Harvey was not required to seek further exhaustion where

he was granted satisfactory relief, yet prison officials failed to provide the remedy promised.  Id.,

at 685.  Here, defendants did not allege that plaintiff failed to exhaust his administrative

remedies, and plaintiff argues that defendants failed to provide him the relief sought through his

administrative appeals.  Thus, Harvey is inapposite.

Despite the court's supplemental briefing order, plaintiff's supplemental

opposition is not verified.  (Dkt. No. 93.)  Plaintiff concedes that he relies on "all the exhibits and

appendixes that the defense . . . used . . ."  (Dkt. No. 93 at 14.)[9]

Plaintiff claims that prior to his return to prison in 2007, Dr. Lawrence Wolfe, a

general practitioner, diagnosed plaintiff with HCV in 2004, and referred plaintiff to Dr. Mindy

Nuygen, a liver specialist.  (Dkt. No. 93 at 5, 7.)  Plaintiff alleges that both these doctors told

plaintiff they would take monthly blood tests to monitor any change in plaintiff's viral load count

because that "would be a strong indicator" of when plaintiff should consider treatment with

ribavirin and interferon.  (Dkt. No. 93 at 5-6.)

Plaintiff claims that at the time he paroled from state prison in 2002, plaintiff was

prescribed the following medications by an unnamed CDCR contract psychiatrist:

> 450 mg Wellbutrin XL once every morning
> 400 mg Seroquel once every night
> 100-200 mg Trazodone, as needed, once at night
> 6 mg Klonopin three times a day (antipsychotic)

(Dkt. No. 93 at 6.)  Also, Dr. Wolfe allegedly prescribed plaintiff 500 mg Acetaminophen and 5

mg Oxycodone for sciatica pain.  (Id.)  Plaintiff alleges that Drs. Wolfe and Nuygen told plaintiff

that these medications were of an "acceptable" level of toxicity to plaintiff's liver, "as evidenced

by the fact [his] viral load maintained a constant level between the range of 250-350,000[,] . . .

never higher than 350,000."  (Id.)  Plaintiff claims that his viral load only climbed after his return

to prison, and alleges that his viral load has jumped up into the millions due to the alternate

psychotropic medications that defendant Dr. Chambers prescribed.  (Dkt. No. 93 at 9.)  Plaintiff

---

[9]  Indeed, plaintiff's supplemental opposition was filed amidst what appears to be
plaintiff's copy of defendants' motion for summary judgment.  (Dkt. No. 93.)

1   contends these alternate medications are toxic to his liver.

2        Plaintiff argues that defendants should have called Dr. Wolfe or Dr. Nuygen, or

3   plaintiff's parole psychiatrist, to inquire what medication regimen previously worked on

4   plaintiff's myriad medical and mental health issues, and treated plaintiff accordingly.  (Dkt. No.

5   93 at 7.)  Plaintiff argues that their failure to do so constitutes deliberate indifference to his

6   serious medical needs.

7        However, plaintiff failed to provide evidence or an expert medical opinion

8   supporting his position.  Plaintiff did not provide a declaration from Dr. Wolfe or Dr. Nuygen, or

9   his parole psychiatrist, confirming that plaintiff's medication protocol in prison since 2007 was

10  toxic to his liver or caused his viral load to increase, or that the medication protocol prescribed to

11  plaintiff prior to his return to prison in 2007 was the only medication protocol that would

12  effectively treat plaintiff's medical and mental health issues.  Accordingly, as argued by

13  defendants, plaintiff's unverified statements are inadmissible hearsay which are not supported by

14  the prescribing doctors or by medical records.  Fed. R. Evid. 802 (hearsay) and 1002 (content of

15  writing).  In addition, plaintiff's conclusions as to the affect of the medications prescribed since

16  his return to prison in 2007 are his personal lay opinion, and are insufficient to rebut defendants'

17  medical evidence.  Hutchinson, 838 F.2d at 392.

18        Defendant Dr. Chambers opined that:

19          all psychotropic medications are relatively benign on a patient's
            liver.  Despite [plaintiff's] claims to the contrary, it is my
20          professional medical opinion that the two blood tests plaintiff uses
            to support his contention that his liver was harmed by the
21          psychotropic medications are two different types of tests.
            Accordingly, the values in the respective tests do not correspond to
22          show any conclusive effect on plaintiff's liver or viral loads.  In
            addition, a "viral load" is not a measure of any damage to one's
23          liver, but rather, a measure of the severity of a viral infection in the
            body.  As such, plaintiff's viral loads only correlate with the
24          likelihood of sustained viral responses to antiviral therapy with
            pegylated interferon and ribavirin.  Plaintiff's Hepatitis C was
25          diagnosed in 2004, long before my treatment of plaintiff began in
            2007 and, thus, it is my professional medical opinion that my
26          treatment of [plaintiff] did not cause or contribute to that disease or

27

1    its effect on his liver.

2    (Dkt. No. 90-8 at 5.)  Also, defendant Dr. Robinson, a board-certified internal medicine

3    physician, confirmed that "[t]he choice of psychiatric medications has no influence or bearing on

4    the status of [plaintiff's] hepatitis C, including viral loads."  (Dkt. No. 90-5 at 21.)  Defendants

5    adduced undisputed evidence that plaintiff had repeated tests for ALT elevations, which would

6    indicate liver damage, but his ALT tests were normal, as were his AFP tests for liver cancer and a

7    liver ultrasound.  (UDF 46.)  Plaintiff showed no signs of cirrhosis or end-stage liver disease.

8    (Id.)  Chief Physician Dr. Fox also confirmed that:

9            Contrary to [plaintiff's] belief, hepatitis C (HCV) viral loads do not
             correlate with liver damage, the severity of hepatitis C, or a poor
10           prognosis.  Viral loads only correlate with the likelihood of a
             sustained viral response (SVR) to antiviral therapy with pegylated
11           interferon and ribavirin.

12   (Dkt. No. 90-4 at 42.)  Because plaintiff failed to rebut defendants' medical evidence, plaintiff

13   has not shown that there is a triable issue of material fact as to whether defendants were

14   deliberately indifferent to plaintiff's serious medical needs by refusing to prescribe plaintiff non-

15   formulary medications.

16          Moreover, as described in the undisputed facts set forth above, defendants also

17   provided medically-supported reasons for not prescribing non-formulary drugs to plaintiff:

18          Seroquel (quetiapine) poses an increased risk of obesity and glucose intolerance,

19   particularly for patients at risk for diabetes; plaintiff was obese and at risk for diabetes.

20          Trazodone carries an increased risk of seizures when taken with other seizure

21   medications, and plaintiff was prescribed Dilantin for seizures.

22          Klonopin carries an increased risk of suicide and sedating effects in patients who

23   are also taking antidepressants, like plaintiff.

24          Vicodin (acetaminophen and hydrocodone) was recommended for removal by an

25   FDA panel in 2009 because of the high likelihood of overdose and liver damage from the

26   acetaminophen; plaintiff is very concerned about damage to his liver in light of his HCV.

1       In addition, plaintiff had a history of amphetamine and polysubstance abuse, and

2  each of the five drugs plaintiff wanted doctors to order upon his arrival at DVI were known to be

3  drugs of abuse, particularly in a prison setting.  (Dkt. No. 90-5 at 19.)

4       Plaintiff failed to adduce facts or evidence demonstrating that defendants

5  prescribed these alternate medications for reasons that would constitute deliberate indifference to

6  plaintiff's serious medical needs.

7       Plaintiff next claims that defendant Chambers refused to write plaintiff

8  prescriptions of nonformulary drugs, but, allegedly to pacify plaintiff, defendant Chambers told

9  plaintiff he would write three separate rounds of medications which plaintiff would take for six

10  week periods, after which Dr. Chambers would take a blood level to ensure plaintiff was taking

11  the medication, and after the third round, if plaintiff found the drug ineffective, Dr. Chambers

12  would write a prescription for the nonformulary drugs.  However, plaintiff alleges that following

13  the third round, Dr. Chambers stated he could not find the test results taken after the six week

14  period, and then subjected plaintiff to a fourth and fifth round of medication, ultimately refusing

15  to prescribe plaintiff the nonformulary drugs that had successfully worked for plaintiff in the

16  past.  Dkt. No. 93 at 5-6.)  However, plaintiff failed to adduce evidence that any of these

17  prescriptions actually harmed plaintiff's liver.  At bottom, plaintiff's disagreements with

18  defendant Dr. Chambers' choice of medications, without more, do not rise to the level of an

19  Eighth Amendment violation.  Mere differences of opinion concerning the appropriate treatment

20  cannot be the basis of an Eighth Amendment violation.  Jackson, 90 F.3d at 332; Franklin, 662

21  F.2d at 1344.  Plaintiff failed to adduce evidence demonstrating that the prescriptions issued by

22  defendant Dr. Chambers were medically unacceptable under the circumstances.

23       In support of his supplemental opposition, plaintiff appended copies of Roe v.

24  Sims, 2007 WL 951920 (C.D. Ill. 2007), and Roe v. Elyea, 631 F.3d 843 (7th Cir. 2011).  (Dkt.

25  Nos. 93 at 56-67; 93-1 at 125-47.)  However, plaintiff did not address the application of either

26  Roe case to plaintiff's case.  (Dkt. No. 93 at 1-14.)

1     In the first <u>Roe</u> case, four plaintiffs with HCV alleged that the prison's treatment

2  policy for HCV was deliberately indifferent because it failed to follow federal guidelines for the

3  treatment of HCV, defendants refused to timely administer needed liver biopsies, and defendants

4  refused to allow the administration of effective medication.  <u>Sims</u>, at *1.  The Seventh Circuit

5  district court granted summary judgment to defendants Walker (Director of the Illinois

6  Department of Corrections) and Warden Sims, finding they were entitled to rely on Dr. Elyea's

7  medical expertise in setting prison policy on the medical treatment of inmates with HCV.  <u>Id.</u>, at

8  *7-8.  However, defendant Elyea's motion for summary judgment was denied because the facts

9  were not sufficiently developed,[6] and the motion did "not demonstrate the absence of disputed

10  issues of material fact."  <u>Sims</u>, at *9.

11     Such is not the case here.  Defendants adduced evidence concerning plaintiff's

12  myriad medical and mental health treatment, and plaintiff failed to rebut defendants' medical

13  evidence demonstrating their reasons for prescribing alternate medications, and that these

14  alternate drugs were benign to plaintiff's liver, and would not affect plaintiff's viral load.

15     In the second <u>Roe</u> case, each of the plaintiffs claimed that during their

16  incarceration, each was refused or delayed treatment for HCV, and that defendant Elyea

17  knowingly instituted a protocol for the diagnosis and treatment of HCV that fell below

18  constitutionally accepted standards of medical care for inmates.  <u>Elyea</u>, 631 F.3d at 847.

19     Here, however, plaintiff is not challenging the protocol for the diagnosis and

20  treatment of HCV; rather, plaintiff claims that the alternate psychotropic medications unduly

21  harmed his liver, which was already compromised due to HCV.  As set forth above, plaintiff

22  failed to rebut defendants' medical evidence that the alternate psychotropic medications did not

23

24     [6]  The court in <u>Sims</u> noted the deficiencies in the record:  "For example, no one offers
   what kind of Hepatitis C Roe has, what genotype it is, the particular levels of Roe's enzymes now
25  or in prison, whether Roe had other indicators of liver disease in prison, when he was seen by
   physicians, and what those physicians did, if anything, in response to Roe's concerns.  There are
26  no affidavits from treating physicians and no medical records."  <u>Id.</u>, at *9.

1   affect plaintiff's liver.

2          In addition, in the instant action, unlike in <u>Sims</u> or <u>Elyea</u>, plaintiff does not

3   challenge the treatment for his HCV.  In any event, defendants adduced evidence demonstrating

4   that when plaintiff left DVI, he was treated for HCV with pegylated interferon and ribavirin, but

5   plaintiff stopped treatment because he mistakenly believed that sores in his mouth and on his

6   buttocks were side effects of the medication, rather than infections as his doctors diagnosed.

7   (Dkt. No. 90-5 at 25.)  Plaintiff was warned that he could not suspend and then re-start the HCV

8   therapy whenever he wanted, and then plaintiff signed a refusal of further treatment.  (<u>Id.</u>)  In

9   early November 2009, plaintiff was noted to still have detectable virus, meaning plaintiff had not

10  achieved a sustained viral response at the time he stopped taking the anti-viral therapy.  (<u>Id.</u>)  A

11  week later, plaintiff told staff he stopped taking medications for hypothyroidism and

12  hypertension because he thought that might help him get rid of the infections in his mouth and

13  buttocks.  (<u>Id.</u>)  These allegations, which plaintiff failed to rebut with competent evidence,

14  differentiate this case from the allegations in <u>Sims</u> and <u>Elyea</u>.

15         To the extent plaintiff seeks to hold defendants liable for their failure to prescribe

16  non-formulary psychotropic medications to plaintiff that were previously effective, based on

17  challenges to the formulary or to the criteria for prescribing non-formulary medications, such

18  claims are also unavailing.  Defendants' argument that challenges to the formulary, or to the

19  criteria for their nonformulary use, must be raised in <u>Plata</u>, Case No. C-01-1351 THE, is well-

20  taken.  Because defendants adduced evidence that the receiver in <u>Plata</u> is responsible for

21  determining the formulary and criteria for medications on a non-formulary basis, and plaintiff

22  failed to rebut such evidence, defendants cannot be held liable for the receiver's decisions.

23         Finally, plaintiff alleges that he was told that Dr. Francheschi ordered defendant

24  Dr. Chambers and Dr. Evans to discontinue plaintiff's prior prescriptions, and prescribe plaintiff

25  medications under the new formulary.  (Dkt. No. 22 at 5.)  However, plaintiff adduced no

26  evidence in his opposition to support this allegation.  But even assuming, arguendo, that Dr.

1   Francheschi ordered that plaintiff receive medications under the new formulary, plaintiff failed to

2   adduce evidence that the new medications prescribed by his treating psychiatrists were harmful to

3   his liver or were medically inappropriate.  Accordingly, Dr. Francheschi is also entitled to

4   summary judgment.

5   IV.  <u>Administrative Appeals</u>

6           Plaintiff alleges that defendants Fox, Kimura-Yip, Livingston, Raniseski,

7   Robinson, Rodriguez, and Wilson are liable based on their role in the inmate grievance process.

8   However, prisoners have no stand-alone due process rights related to the administrative

9   grievance process.  <u>See</u> <u>Mann v. Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988); <u>see</u> <u>also</u> <u>Ramirez v.</u>

10  <u>Galaza</u>, 334 F.3d 850, 860 (9th Cir. 2003) (holding that there is no liberty interest entitling

11  inmates to a specific grievance process).  Put another way, prison officials are not required under

12  federal law to process inmate grievances in a specific way or to respond to them in a favorable

13  manner.  Because there is no right to any particular grievance process, plaintiff cannot state a

14  cognizable civil rights claim for a violation of his due process rights based on allegations that

15  prison officials ignored or failed to properly process grievances.  <u>See</u>, <u>e.g.</u>, <u>Wright v. Shannon</u>,

16  2010 WL 445203 at *5 (E.D. Cal. Feb.2, 2010) (plaintiff's allegations that prison officials denied

17  or ignored his inmate appeals failed to state a cognizable claim under the First Amendment).

18  Thus, defendants Fox, Kimura-Yip, Livingston, Raniseski, Robinson, Rodriguez, and Wilson are

19  entitled to summary judgment on plaintiff's due process claim.

20          Moreover, plaintiff's Eighth Amendment allegations that defendants Fox,

21  Kimura-Yip, Livingston, Raniseski, Robinson, Rodriguez, and Wilson failed to properly handle

22  plaintiff's administrative appeals concerning plaintiff's medications also fail because these

23  defendants were entitled to rely on plaintiff's treating psychiatrists' expertise in prescribing

24  medications.  Defendant Wilson, a Staff Services Analyst at DVI, reviewed plaintiff's inmate

25  appeal, identified a psychiatrist who could address plaintiff's appeal issue, and scheduled

26  plaintiff to see psychiatrist Dr. Evans on June 5, 2008.  (Dkt. No. 90-3 at 25-26.)  In his

opposition to the motion, plaintiff adduced no evidence demonstrating defendant Wilson was

deliberately indifferent, and, because defendant Wilson is not a psychiatrist, she could not

prescribe alternative medications for plaintiff.  Similarly, defendants Dr. Fox (physician),

Kimura-Yip (deputy director who holds no medical or psychiatry degree), Livingston (nurse),

Raniseski (psychologist), Dr. Robinson (physician), Rodriguez (health program specialist), could

not prescribe alternative psychiatric medications for plaintiff, and were entitled to rely on the

expertise of plaintiff's treating psychiatrists.  Moreover, because the evidence adduced by

defendants demonstrates that plaintiff was prescribed alternate medications to address his mental

health and medical needs, and that the alternate psychotropic medications were benign to

plaintiff's liver, defendants Fox, Kimura-Yip, Livingston, Raniseski, Robinson, Rodriguez, and

Wilson are also entitled to summary judgment on plaintiff's Eighth Amendment claims.

V.   Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that:

1.   Defendants' June 15, 2012 motion for summary judgment (dkt. no. 90) be

granted; and

2.   This action be dismissed.

These findings and recommendations are submitted to the United States District

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

objections shall be filed and served within fourteen days after service of the objections.  The

////

////

////

////

1   parties are advised that failure to file objections within the specified time may waive the right to

2   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3   DATED:  January 3, 2013

4

5                                                    KENDALL J. NEWMAN

6                                                    UNITED STATES MAGISTRATE JUDGE

7   coat1830.msj

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26